UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:17-cr-0121-JAD-PAL |
| Plaintiff, | **REPORT OF FINDINGS AND RECOMMENDATION** |
| v. | |
| GILBERTO CISNEROS, | (Mot Dismiss or Suppress – ECF No. 30) |
| Defendant. | |

Before the court is defendant Gilberto Cisneros' ("Cisneros") Motion to Dismiss or Alternatively to Suppress Evidence (Evidentiary Hearing Requested) (ECF No. 30) which was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and LR IB 1-4 of the Local Rules of Practice. The court has considered the motion, the government's Response (ECF No. 31), and Cisneros' Reply (ECF No. 33), as well as evidence taken at an evidentiary hearing held November 1, 2017.

## BACKGROUND

Cisneros is charged in an Indictment (ECF No. 13) returned April 19, 2017, with felon of possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). The indictment arises out of an arrest by Las Vegas Metropolitan Police Department ("LVMPD") Officer Propp on March 20, 2017 following a traffic stop.

### I.      The Motion to Dismiss or Suppress

In the current motion, Cisneros seeks to dismiss the indictment against him, or in the alternative, to suppress evidence arising out of the stop and arrest. The motion to dismiss argues that documents produced in discovery in this case indicate the arresting officer filled out reports stating that when Officer Propp initiated the stop, he got out of his patrol car with his body camera recording. However, the government informed defense counsel that there was no bodycam

1

recording. Cisneros argues that the failure to preserve the bodycam recording of this stop constitutes a due process violation because the lost evidence may be potentially exculpatory and the defendant is unable to obtain comparable evidence by other reasonably available means.

Alternatively, he seeks to suppress evidence derived from the stop and arrest asserting Fourth and Fifth Amendment violations occurred. First, he alleges that Officer Propp did not have specific and articulable facts that Cisneros was armed and presently dangerous to justify a pat down which recovered the firearm at issue in this indictment. He acknowledges that in a traffic stop setting, police may detain an automobile and its occupants pending inquiry into a vehicular violation based on reasonable suspicion. However, to justify the pat down of the driver, the police must have reasonable suspicion that the person subjected to the frisk is armed and dangerous. Reasonable suspicion is an objective standard. The court must determine whether a reasonably prudent person would have been warranted in believing the suspect was armed and presented a threat to the officer's safety while he was investigating suspicious behavior. The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, justify the intrusion caused by the pat down. The court applies a totality-of-the-circumstances test. Here, Cisneros claims the government cannot meet its burden of showing articulable, particularized facts to establish reasonable suspicion that Cisneros was armed and dangerous when Propp patted him down.

Cisneros also argues that the traffic stop in this case was unjustifiably prolonged and exceeded the scope of a permissible traffic violation stop. Citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005), Cisneros argues that a seizure lawful at its inception may violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. The Supreme Court requires that the length and scope of detention be strictly tied to and justified by the circumstances which rendered its initiation permissible. Tasks unrelated to the purpose of the stop are unlawful if they add time to the stop and are not otherwise supported by independent reasonable suspicion of wrongdoing. Here, Cisneros claims Propp unlawfully prolonged the length and exceeded the scope of the traffic stop by patting Cisneros down instead of merely taking his license and writing a ticket for minor traffic violations.

2

Third, Cisneros claims that Propp's actions ripened into an arrest that was not supported by probable cause. In determining whether an arrest has occurred, the court considers both the intrusiveness of the stop, and the degree to which the defendant's liberty was restricted as well as the justification for the use of police tactics. An arrest must be supported by probable cause, which is determined under the totality of the facts and circumstances known to the arresting officer at the time of the arrest. The test is whether a prudent person would have concluded that there was a fair probability that the suspect had committed a crime. Here, Cisneros claims the officer's actions "ripened into an arrest" for many of the same reasons that he claims Propp unlawfully prolonged the traffic stop. Cisneros was patted down, his gun was seized, and he was placed in handcuffs in the back of the patrol car. These intrusive actions, Cisneros argues, were disproportionate to the situation Officer Propp faced. Cisneros was cooperative and non-threatening, and at no point did Propp have probable cause to arrest Cisneros until he ran a records check and learned Cisneros had a prior felony conviction.

Fourth, Cisneros argues the court should suppress all fruits of the unconstitutional pat down and prolonged seizure under the fruit of the poisonous tree doctrine. This includes the gun seized from his waistband and any statement or DNA evidence collected from Cisneros while he was in custody at the Clark County Detention Center.

Finally, the motion asked for an evidentiary hearing to determine if the government could meet its burden of establishing that Cisneros received and waived *Miranda* warnings before a custodial interrogation. The original police report and Officer Propp's declaration of arrest in this case make no mention of any *Miranda* warnings being administered or waived. The original arrest report and declaration of arrest do not mention any interrogation. Only an amended arrest report provides a "somewhat detailed description" of the warnings, the waiver, and the interrogation. However, the amended report is undated, unsigned, and not approved by a supervisory officer. Under these circumstances, Cisneros claims the government must prove at an evidentiary hearing that sufficient *Miranda* warnings were given and a valid waiver was obtained.

/ / /

/ / /

3

## II.     The Government's Response

The government opposes the motion arguing that Cisneros' traffic stop and pat down were lawful under the totality of the circumstances. The government claims that on March 20, 2017, at approximately 4:40 p.m., Officer Propp initiated a traffic stop by activating his lights and sirens after observing Cisneros commit multiple traffic violations. Cisneros did not initially stop his motorcycle and continued driving for approximately 150 yards. Once stopped, Propp observed the defendant wearing a "Mongols" vest. Propp could not "make out his face" because he was wearing a helmet and a face mask and looking away from the officer. The government claims that recent criminal events, including an attempted murder involving rival motorcycle gangs, and the fact that Cisneros was wearing "gang-related clothing" caused the officer to exercise extreme caution. Officer Propp told Cisneros to get off the motorcycle, move to the front of the police vehicle, and place his hands behind his back. Officer Propp then informed Cisneros that he was going to conduct a pat down for weapons for officer safety and almost immediately felt the bulge of a handgun in the waistband. Propp then handcuffed Cisneros and conducted a records check which revealed that Cisneros had felony convictions which prohibited him from lawfully possessing a firearm. Cisneros was then placed into the back of the police car, arrested, and transported to jail. At the police station, Propp read Cisneros *Miranda* warnings which Cisneros waived. During questioning Cisneros admitted to possessing the firearm.

The government argues the court should deny the motion to dismiss because Officer Propp did not engage in any bad faith. The failure to record the stop and arrest was the result of an equipment malfunction. Evidence was never collected and therefore could not have been preserved or destroyed. The case that Cisneros relies upon, *California v. Trombetta*, 467 U.S. 479 (1984), deals specifically with evidence that was collected and later destroyed. However, in *Miller v. Vasquez*, 868 F.2d 1116, 1119 (9th Cir. 1989), the Ninth Circuit held that *Trombetta* does not create a duty on behalf of law enforcement to *obtain* evidence. The defense does not claim that Propp or Cisneros did or said anything that, if captured on video, would be critical to the defense case, or prove to be exculpatory. To prevail on a failure to collect evidence challenge, the defendant must show that the officer acted in bad faith. No bad faith occurred here. Officer Propp

4

believed his bodycam was working, but later found this was not the case and made efforts to get it working while at the scene. Propp's March 19, 2017 report indicates he was able to record portions of the stop after Cisneros was handcuffed and while *Miranda* warnings were given. The government acknowledges that the defense was not provided with the bodycam recording Propp was able to record until after this motion was filed. Counsel for the government apologizes and represents that he recalled discussions about bodycam videos with defense counsel, but did not realize until after the motion was filed that available bodycam videos were not produced.

The government argues that Officer Propp had reasonable suspicion to conduct a traffic stop and direct Cisneros to get off his motorcycle. The government also claims Officer Propp had reasonable suspicion to conduct a pat down for officer safety. The government argues maintains reasonable suspicion requires a particularized and objective basis for suspecting legal wrongdoing which is less than the showing required for probable cause. Reasonable suspicion is dependent upon the content of the information the officer has and its degree of reliability under the totality of the circumstances. The Supreme Court has recognized that traffic stops are dangerous. The Supreme Court has also recognized that officers must routinely exercise unquestioned command of the situation during a traffic stop to reduce the risk of harm to police and vehicle occupants. In this case, Cisneros failed to stop his motorcycle for approximately 150 yards, looked away from the officer once stopped, and was wearing an oversized "Mongols" motorcycle vest with a "1%" patch symbolizing his affiliation with a motorcycle gang with a history of criminal activity. Officer Propp was alone and knew of recent altercations with other motorcycle groups. It was therefore reasonable to conduct a brief and immediate pat down for weapons which revealed the gun on Cisneros' waistband.

The government also contends that an officer may prolong a traffic stop if the prolongation is supported by independent reasonable suspicion. This is what occurred in this case. Less than five minutes after the initial stop, Officer Propp had retrieved the handgun, ran the defendant's criminal record, and determined he was a convicted felon before placing him in the patrol car. Under these circumstances, the stop was not unjustifiably prolonged or disproportionate as evidenced by the available video.

5

Finally, the government maintains that Cisneros received and waived appropriate *Miranda* warnings prior to being questioned about the firearm.

### III.    The Reply

Cisneros' replies that the inconsistencies in Propp's written reports and the bodycam recordings that were preserved call into question Propp's credibility.  Officer Propp is a key witness in this case.  A missing body camera recording is exculpatory.  It is not credible to believe that Officer Propp was able to record only after Propp had stopped Cisneros, patted him down, found and seized the gun, and placed Cisneros in handcuffs.  From what Cisneros understands, two other uniformed officers' bodycam recordings also started recording after Cisneros was in handcuffs and standing at the hood of Propp's patrol vehicle.  The timing and consistency of the start time of the recordings "does not seem coincidental."  Defense counsel requested bodycam recording by email on April 28, 2017.  The government responded it would send the recording over when it was received.  During follow up discussions, counsel for the government informed defense counsel that there were no body camera recordings in this case.  However, on July 19, 2017, the government forwarded Officer Propp's report about his body camera which was dated March 19, 2017.  An email chain reflects that Officer Propp emailed this report to the government's FBI case agent on May 1, 2017.  Only after the defense filed a motion to dismiss or suppress did government counsel inform defense counsel the government had had the bodycam recording since April 2017.

The reply also reiterates arguments raised in the motion that the government has the burden of establishing a valid basis for the traffic stop.  The government's opposition to the motion does not identify facts that support a reasonable belief that Cisneros was armed or presently dangerous to justify the pat down.  The government's response also fails to show each point of the stop was justified, or that Propp possessed probable cause at the point Cisneros' detention ripened into an arrest.  Finally, with respect to the Fifth Amendment violation, the government claims that bodycam recording provided Cisneros *Miranda* warnings at the police station and that Cisneros waived prior to being questioned about the firearm.  However, the bodycam recording was not attached to the response.  The government's response does not meet its heavy burden to prove a

valid *Miranda* waiver.  The court should therefore grant the motion to dismiss, or alternatively, to suppress.

## IV.  The Evidentiary Hearing

At the evidentiary hearing the government called two witnesses, LVMPD Officer Anthony Propp, and Detective Shane Price.  After the government rested, the court canvassed Cisneros about whether he understood he had the right to testify or not.  Mr. Cisneros acknowledged he understood his rights and stated that after conferring with counsel, it was his decision not to testify at the evidentiary hearing.

### A.  Testimony of Officer Propp

Officer Propp has been employed by LVMPD for approximately three years and is assigned to regular patrol.  On March 20, 2017, he was in uniform in a marked patrol vehicle when he observed the defendant, Gilberto Cisneros, driving a motorcycle.  He pulled Cisneros over for traffic violations in the area of Lake Mead and Nellis Boulevard in Las Vegas.  Propp observed Cisneros driving in a construction zone going through marked pylons and cones.  These were put up as traffic control devices to protect construction workers.  Propp pulled behind Cisneros as Cisneros made a northbound turn on Nellis.  Propp observed Cisneros go from the #1 to the #2 to the #3 lane without staying in the far #1 lane.  Cisneros did not signal when he changed lanes, but did signal when he turned left onto Nellis.  Propp activated his lights and sirens near the area where the Taqueria Arandas is located.  Cisneros traveled "a pretty significant distance" past the entrance of a couple of businesses before eventually pulling over.  This caused Propp some concern that Cisneros did not immediately pull over after he activated his lights and siren.  However, Cisneros was not driving recklessly.

Propp could not see what Cisneros was doing with his hands when he initially pulled him over.  Once Cisneros stopped Propp got out of his vehicle and asked Cisneros to step off the motor vehicle and approach the patrol car.  He then patted Cisneros down for weapons.  When asked if there was anything that led Propp to pat Cisneros down, Propp testified the first reason he patted Cisneros down was because of the amount of time it took Cisneros to stop.  Many times when a suspect delays pulling over, they are thinking about what they are going to do next, calling people,

or "whatever the case may be." Another reason he conducted a pat down was because Propp was alone. He called for backup, but it would take time for officers to respond. Additionally, it was warm that day and Cisneros was wearing a baggy shirt, baggy pants, and had a biker's vest on. The fact that the biker's vest said "Mongols" on it concerned him because the Mongols is a violent motorcycle gang in Las Vegas and across the United States. As he also noted in his report, he was aware there was an ongoing feud between the Hells Angels and the Vagos, and that there had been many violent encounters between those groups and law enforcement. For all of these reasons, he decided to pat Cisneros down.

Officer Propp described the area where the stop occurred as a high crime area testifying that "around this time it was a hot spot, as they call it, basically where there is a lot of violent crime occurring. So that was part of our proactive area." Transcript (ECF No. 40) 16:20-23. Officer Propp had experience with Mongols and was involved in an investigation a couple of weeks prior to the stop. The prior incident involved a stolen vehicle which involved Cisneros. *Id.* 18:11-18. While investigating the prior incident, there were a number of individuals that officers could not identify who showed up on the case. *Id.* 18:21-23. Other motorcycle members arrived during his stop of Cisneros. *Id.* 19:7-16.

Cisneros complied with the direction to get off his motorcycle and approach the patrol car. Propp conducted a pat down for weapons and felt what he believed was a firearm. *Id.* 19:21-25. Propp recovered a Glock .40 caliber weapon from the right side of Cisneros' hip inside his shirt and vest. *Id.* 20:9-16. At the time of the stop Cisneros was wearing a helmet and a mask or bandana that covered the lower part of his face. *Id.* 20:20-25.

Simple possession of a firearm is not a violation of Nevada law. *Id.* 21:6-8. Carrying a concealed firearm is not against Nevada law if a person has a permit. *Id*. 21:9-11. This firearm was concealed which is unlawful without a permit. *Id.* 21:12-17. Propp's typical procedure when a weapon is recovered is to secure it, put the individual in handcuffs, and investigate. *Id.* 21:18-23.

On the date of the stop Propp was wearing a bodycam. He turned on the bodycam when he first pulled over Cisneros. *Id.* 22:1-5. However, the camera did not initially work. *Id.* 22:6-7.

8

He found out the bodycam was not working when "the situation became a lot less dynamic"—that is, when Cisneros was in handcuffs and Propp was conducting his follow up investigation. *Id.* 22:9-12. A disk containing Propp's bodycam video was marked and admitted as Government's Exhibit 2 and played in open court with Propp describing what it depicted. Propp discovered after Cisneros was in handcuffs that the bodycam was not working. He did not hear the beep from his camera, checked it, and hit the button again which turned the camera on. *Id.* 24:4-12. At the start of his shift the day of this incident, he went to the bodycam detail in the department to get a new wire because he was having issues with the bodycam the day prior. *Id.* 24:18-22.

Propp estimated that it was a minute or two between the time that Cisneros got off the motorcycle until the pat down discovered the firearm. *Id.* 25:9-13. The bodycam video starts two or three minutes after that. *Id.* 25:17-18. Based on these estimates, about five minutes of the stop was not recorded on bodycam. *Id.* 25:19-21.

Propp learned that Cisneros was a convicted person as soon as he ran Cisneros through the system and found he was a prohibited person, that is, someone who could not legally possess a firearm. *Id.* 26:7-20.

Propp was involved in a stolen vehicle incident which involved Cisneros a couple of weeks prior to this stop. *Id.* 27:20-22. Propp responded to a call of a stolen vehicle made by a different biker group. The group reported that there was a stolen engine from the vehicle that was nearby in the front yard of Mr. Cisneros' apartment. *Id.* 28:12-18. Propp got a consent to search for stolen parts inside the apartment. *Id.* 28:23-25. Inside the apartment there were several Mongols and Takers vests. Takers is "a club that is kind of part of the Mongols." *Id.* 28:25–29:2. Propp recognized the motorcycle Cisneros was riding from the prior incident because it was parked in front of the apartment he was investigating. *Id.* 29:13-16. Propp contacted the Central Intelligence Unit because of his investigation of the prior incident and from information learned from the records check conducted on Cisneros. Propp was able to identify the female who arrived at the time of the stop as Cisneros' girlfriend. *Id.* 31:18-22.

Propp read Cisneros *Miranda* warnings once they arrived at the Northeast Area Command in an interview room. *Id.* 33:1-6. A bodycam showing the administration of *Miranda* warnings

9

was marked and admitted as Government's Exhibit 3. Officer Propp also identified Government Exhibit 4 as an exact copy of the *Miranda* warning card he used. Cisneros agreed to talk to the detective after receiving and waiving *Miranda* rights. *Id.* 36:2-8. Propp asked Cisneros a couple of questions later. *Id.* 36:10-11. Propp could not recall the time, but it was later that day at the police station. Propp could not recall the questions he asked or the answers that were given. *Id.* 37:2-4.

Even if Cisneros had not been wearing a Mongols jacket Propp believed he would have patted Cisneros down because he was wearing baggy clothes. *Id.* 38:8-14. It is easy to conceal weapons in baggy clothing, and when it is warm out in Las Vegas "if someone is wearing baggy clothes and it's warm, I typically like to pat them down." *Id.* 38:16-21.

On cross-examination, Propp acknowledged that when he spoke to intel, he told the officer it took Cisneros "a little sec" to stop. *Id.* 42:7-11. On redirect, Officer Propp explained that this was police "lingo." *Id.* 70:16-24. He meant that it took a while for Cisneros to stop. *Id.* 70:25-71:3.

After the stop Cisneros was compliant. Propp did not recognize Cisneros when he stopped him, or before he patted him down. *Id.* 44:1-6. However, he recognized the motorcycle from the prior incident once he got close. *Id.* 44:7-15. Cisneros walked to Propp. *Id.* 44:15-17. He kept his hands to his side other than taking off his mask [bandana]. *Id.* 44:21-25. Propp patted down Cisneros within seconds of when he stepped forward to the patrol car. *Id.* 45:7-11. Cisneros did not do or say anything aggressive during the encounter. *Id.* 45:18-22.

Propp was alone on patrol that day. It is not unusual to stop someone alone. *Id.* 46:10-12.

Propp agreed that approximately four minutes elapsed from the time that he stopped Cisneros until his bodycam video starts. *Id.* 46:19-22. By then two other backup officers had arrived. *Id.* 46:23-25. Propp estimated that he was on the scene with Cisneros for approximately 30 minutes before they left. *Id.* 47:6-9. Cisneros was in the back of the patrol car for most of this time. *Id.* 47:21-23.

Propp recognized Cisneros' motorcycle because it had been parked outside an apartment that he searched with consent. *Id.* 49:9-50:11. During the prior investigation, he found firearm

10

parts and ammo and magazines in the apartment. *Id.* 70:14-15. During the prior incident he had contact with Cisneros' girlfriend who was cooperative. *Id.* 50:21-25.

Cisneros did not have a warrant at the time of the initial stop. *Id.* 51:20-22. Exhibit B, an extension of government's Exhibit 2 of Officer Propp's bodycam video for the traffic stop, was marked and admitted in evidence. Propp reiterated that he would have patted Cisneros down even if he had not had a motorcycle vest on. *Id.* 54:22-24. Propp believed he could pat Cisneros down whether or not he had his jacket on because of the rest of the clothing he was wearing and the area that he was in. *Id.* 55:11-15. Cisneros was wearing clothing so that Propp could not tell whether he had a gun. *Id.* 55:16-20. Propp did not see a bulge on Cisneros. *Id.* 55:23-24.

Propp did not give Cisneros *Miranda* warnings after finding the gun. *Id.* 59:20-22. However, Propp engaged Cisneros in "dialogue." *Id.* 60:3-6. This dialogue occurred after Cisneros was under arrest. *Id.* 60:24-25. Officer Propp's initial arrest report did not mention that Propp spoke to Cisneros after he had been *Mirandized*; however, an amended report does indicate that after Cisneros was *Mirandized*, Cisneros spoke with detectives, and that Propp later spoke with him. *Id.* 63:9-23.

Defense counsel introduced Exhibit A, Propp's bodycam video at the police station where Cisneros was questioned. The bodycam video indicates that after the detective was through, Officer Propp spoke with Cisneros who told Propp he did not want to answer questions. *Id.* 65:7-21. Propp testified that Cisneros did not give him information about the gun on the video, but "he did later on." *Id.* 66:23-25. This was after Cisneros told Propp he did not want to speak with him. *Id.* 66:11-13. Propp may have spoken with Cisneros after the detective while he was typing up his report. *Id.* 66:14-20. He spoke with Cisneros with his bodycam off. *Id.* 66:21-22. He acknowledged he is supposed to turn his bodycam back on when talking to a suspect. *Id.* 68:15-18. However, in this case he did not do so. *Id.* 68:21-22.

At the time of the initial stop, Cisneros was riding alone. *Id.* 69:21-23. No other motorcycles were near Cisneros at the time of the initial stop. *Id.* 70:7-9.

/ / /

/ / /

11

**B. Testimony of Detective Shane Price**

Detective Shane Price has been employed by LVMPD for approximately sixteen years. He has been a patrol officer, a PSU (Problem Solving Unit Officer) and assigned to the local area command. He has also been a detective in four different bureaus for over ten years. He was working as a detective on March 20, 2017, and had occasion to speak to Cisneros. He was called by another detective who stated that Cisneros was in custody at Northwest Area Command and needed to be interviewed. He was present when Officer Propp advised Cisneros of his *Miranda* warnings. Cisneros agreed to answer questions and Detective Price questioned him about the gun recovered from his person. Cisneros told Detective Price that he had a Glock model 22 on his person at the time of the stop that he had purchased or obtained a couple of weeks prior. Cisneros stated that the gun was "legit or good" meaning it was not stolen. Cisneros stated he had the gun for protection.

On cross-examination, Detective Price testified that he did not prepare any reports, but did review the arrest report and amended arrest report. Detective Price did not wear a bodycam while interviewing Cisneros. Cisneros stated that he carried the gun for protection.

Detective Price was not present when Propp spoke with Cisneros after his own interview. Detective Price saw Propp enter the room. He did not recall whether Propp reported that Cisneros stated some additional things testifying that the night was a "bad night" and officers were involved in some other incidents. Detective Price spoke with Propp who stated that he (Propp) had talked to Cisneros after Detective Price "and apparently Mr. Cisneros wouldn't talk to him at that point." *Id.* 80:18-24.

**C. Oral Argument**

At the conclusion of the testimony counsel for Cisneros argued that although the bodycam showed that Cisneros received and waived *Miranda* warnings, she believed there was a *Siebert* problem with *Miranda*. Specifically, she argued that Officer Propp interrogated Cisneros prior to *Miranda* warnings being administered, and the detective then questioned Cisneros. She argued that Officer Propp's bodycam video shows conversation back and forth at the scene of the traffic stop regarding the firearm that Cisneros was carrying for protection. This information was not available

at the time the initial motion to suppress was filed. She therefore requested that the court consider her arguments regarding an unlawful two-step interrogation.

Counsel for Cisneros agreed that it is quite clear from the body cam video that after the initial stop and arrest Propp was attempting to investigate the incident that occurred two weeks prior acknowledging "I don't think this gets us anywhere." *Id.* 88:13. Rather, the defense's primary argument centered on the pat down that occurred in advance of the on scene investigation and the admissions Cisneros made. *Id.* 88:13-15. The defense position was that the stop and pat down were not related to the earlier incident. *Id.* 91:9-10. The government did not dispute this. *Id.* 91:14-15.

The court inquired of counsel for the government whether he intended to admit statements or admissions made by Cisneros to Propp before *Miranda* warnings were administered at the police station. Counsel for the government responded that he was not clear about the extent of Propp's questioning at the scene of the traffic stop. However, he agreed that Officer Propp had no business talking to Cisneros after the detective finished with him, and after Cisneros told Officer Propp on tape that he did not want to talk with Propp. *Id.* 93:21-94:1. Government counsel conceded that any statements made to Officer Propp were inadmissible. *Id.* 94:2-4. With this concession, counsel for Cisneros agreed no further relief was required with respect to the two-step interrogation process argument.

Government counsel also agreed that the government would not seek to admit any admissions obtained by Officer Price during the course of the traffic stop. *Id.* 94:11-15. This would include any acknowledgement that the gun was on his person. *Id.* 94:16-21. Rather, the government intends to rely solely on Detective Price for any testimony regarding admissions Cisneros made. *Id.* 94:22-95:17. The court indicated that the report and recommendation would hold the government to its agreements in this regard and preclude the government from introducing any admissions Cisneros allegedly made to Officer Propp in its case in chief. *Id.* 95:18-23. Both government counsel and defense counsel agreed this was sufficient to cure any issue about admissions made to Propp. *Id.* 95:24-25.

/ / /

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 350–51 (1967). The Fourth Amendment protects "people, not places." *Id*. at 351. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing *Wong Sun*, 371 U.S. at 484–87).

### I.  Applicable Legal Standards

### A.  Loss or Destruction of Evidence

The Supreme Court has held that the Due Process Clause requires the government to preserve evidence "that might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 488 (1984). "The government violates a defendant's due process rights when it destroys potentially exculpatory evidence in bad faith." *United States v. Ubaldo*, 859 F.3d 690, 703 (9th Cir. 2017) (citing *United States v. Estrada*, 453 F.3d 1208, 1212–13 (9th Cir. 2006)). In order for destruction of evidence to rise to the level of a due process violation, a defendant must make two showings: (i) "the government acted in bad faith, the presence or absence of which turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed;" and (ii) "the missing evidence is of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013) (internal quotation omitted) (citing *Arizona v. Youngblood*, 488 U.S. 51, 56–57 (1988); *Trombetta*, 467 U.S. at 489; *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993)). "Another configuration of this test requires the showing of bad faith where the evidence is only potentially useful and not materially

exculpatory." *Sivilla*, 714 F.3d at 1172 (citing *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1149 (9th Cir. 2012); *see also Youngblood*, 488 U.S. at 58. "For evidence to be materially exculpatory, its exculpatory nature must be apparent. *Sivilla*, 714 F.3d at 1172 (citing *Del Toro-Barboza*, 673 F.3d at 1149).

For due process purposes, the presence or absence of bad faith necessarily turns on the officers' "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.1; *Sivilla*, 714 F.3d at 1172. Bad faith requires a showing of malicious intent to withhold evidence that may have value to the defense. *See United States v. Estrada*, 453 F.3d 1208, 1213 (9th Cir. 2006). Negligence in failing to preserve potentially useful evidence is not sufficient to constitute bad faith and does not violate due process. *Grisby v. Blodgett*, 130 F.3d 365, 371–72 (9th Cir. 1997); *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("Bad faith requires more than mere negligence or recklessness."); *Phillips v. Woodford*, 267 F.3d 966, 987 (9th Cir. 2001) (an officer's mere failure to "preserve evidence which could have been subjected to tests which might have exonerated the defendant does not constitute a due process violation") (quoting *United States v. Hernandez*, 109 F.3d 1450, 1455 (9th Cir. 1997)). To merit an evidentiary hearing, a defendant must make a colorable showing that the government destroyed evidence to prevent the disclosure of favorable evidence to the defense, or that the exculpatory value of the evidence was apparent prior to its destruction. *See Phillips*, 267 F.3d at 987. In determining whether there was a due process violation warranting dismissal of the indictment, the evidence must be viewed in the government's favor. *Ubaldo*, 859 F.3d at 703 (citing *United States v. Black*, 733 F.3d 294, 301 (9th Cir. 2013)).

Defense counsel initially believed that no bodycam video was preserved based on information the government produced in initial discovery. After this motion was filed, government counsel produced bodycam video taken at the scene of the stop and at the Northwest Area Command where Cisneros was questioned. It is undisputed that the first four to five minutes of the traffic stop were not recorded on Officer Propp's bodycam video. Propp testified he turned on his bodycam when he first pulled over Cisneros, but the camera did not initially work. He discovered the bodycam was not working when "the situation became a lot less dynamic," that is,

when Cisneros was in handcuffs. At this point he did not hear the camera "beep," recognized it was not working, and turned it on. Propp also testified his bodycam was not working the day before and that he went to the bodycam detail in the department to get a new wire at the beginning of his shift, and before he stopped Cisneros. This testimony was uncontroverted, and the court found Officer Propp's testimony in this regard credible. Cisneros has not shown that Propp acted in bad faith, or that the missing four to five minutes of the initial stop are materially exculpatory. At most, Propp's failure to record the initial portion of the stop was negligent which is not sufficient to constitute bad faith or warrant dismissal on due process grounds. The court will therefore recommend denial of the motion to dismiss for destruction of evidence.

**B. The Initial Traffic Stop**

The Fourth Amendment requires only reasonable suspicion to justify a traffic stop. *Heien v. North Carolina*, --- U.S. ----, 135 S. Ct. 530, 536 (2014); *United States v. Lopez-Soto*, 205 F.3d 1101, 1104 (9th Cir. 2000). Reasonable suspicion is defined as "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien*, 135 S. Ct. at 536 (citing *Prado Navarette v. California*, --- U.S. ----, 134 S. Ct. 1683, 1687–88 (2014). The Ninth Circuit has also defined reasonable suspicion as "specific, articulable facts which, together with objective and reasonable inferences, form the bases for suspecting that the particular person detained is engaged in criminal activity." *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

The reasonable suspicion standard is based on the totality of the circumstances. *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). This standard requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). As long as there is an objectively reasonable basis to perform a traffic stop, the Fourth Amendment will permit the stop. *Whren v. United States*, 517 U.S. 806, 813 (1996).

An officer evaluating whether reasonable suspicion is present is entitled to draw on his or her "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Even

16

reasonable suspicion of a parking violation can justify an investigatory stop of a vehicle. *United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006).

In *Choudhry*, the Ninth Circuit applied *Whren* and held that as long as officers had reasonable suspicion to believe a violation of a traffic code had occurred, the stop was reasonable under the Fourth Amendment and evidence recovered from a traffic stop is admissible. *Id.* at 1102. A traffic violation is sufficient to justify an investigatory stop even if (1) the violation was merely pretextual, *Whren*, 517 U.S. at 811–12; (2) the stop departed from the regular practice of a particular precinct, *id.* at 814–15; or (3) the violation was common and insignificant, *id.* at 818–19.

Here, it is undisputed that Officer Propp observed Cisneros commit traffic violations before initiating the traffic stop. Officer Propp's testimony is uncontroverted that he observed Cisneros drive in a lane restricted by construction traffic control devices and change three lanes without signaling in violation of Nevada traffic laws. Cisneros does not dispute this. Accordingly, the initial traffic stop was based on reasonable suspicion and did not violate Cisneros' Fourth Amendment rights.

Cisneros also argues his Fourth Amendment rights were violated by his prolonged detention which exceeded the permissible scope of the initial stop. The Supreme Court has held that police contact during an investigatory detention must be reasonably related to the circumstances that initially justified the detention. *United States v. Sharpe*, 470 U.S. 675, 682 (1985). An investigative detention must be tailored to its underlying justification and may last no longer than necessary to effectuate the purpose of the stop. *Florida v. Royer*, 560 U.S. 491, 500 (1983). However, it is objectively reasonable under the Fourth Amendment to check a motorist's driver's license and registration. *Id.* General questioning during a traffic stop concerning the starting point, destination and general travel plans are also objectively reasonable. *United States v. Chavez-Valenzuela*, 268 F.3d 719, 724 (9th Cir. 2001). Police are not required to have reasonable suspicion to ask questions beyond the scope of the initial traffic stop. *See United States v. Mendez*, 476 F.3d 1077, 1079–80 (9th Cir. 2007); *United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007); *United States v. Turbin*, 517 F.3d 1097, 1100 (9th Cir. 2008).

17

Cisneros was detained at the scene of the traffic stop for approximately 30 minutes before being transported to the police station where he was interviewed by Detective Price. From the evidence adduced at the evidentiary hearing and from reviewing the bodycam footage of this traffic stop played during the hearing it is clear that Officer Propp kept Cisneros at the scene to advance his investigation of the stolen motorcycle engine he was involved in two weeks prior. During oral argument, counsel for Cisneros agreed that Cisneros was kept at the scene while Propp attempted to advance his earlier investigation of the stolen property, stating that this argument "doesn't get us anywhere". Rather, she argued that the focus of the motion to suppress was based on an illegal pat down which recovered the firearm.

The court need not decide whether Propp had reasonable suspicion to detain Cisneros to further his earlier investigation because Cisneros was clearly under arrest for felon in possession of a firearm within minutes of the initial stop. Propp recovered the firearm in a pat down, ran a records check, found Cisneros was a prohibited person, and arrested him within minutes. For the reasons explained below, the court finds Propp lacked reasonable suspicion to conduct a pat down. The court will therefore recommend that the motion to suppress be granted because the pat down, seizure, and arrest violated Cisneros' Fourth Amendment right to be free from an unlawful search and seizure.

### C. The Pat Down

In *Adams v. Williams*, 407 U.S. 143, 146 (1972), the Supreme Court held that an officer may conduct a limited protective search for concealed weapons if there is reasonable belief the suspect may have a weapon. *See also United States v. Flippin*, 924 F.2d 163, 166 (9th Cir. 1991). An officer making a *Terry* stop is allowed to conduct a limited search of a suspect's person "to determine whether the person is in fact carrying a weapon." *Terry v. Ohio*, 392 U.S. 1, 24 (1968). The purpose of a *Terry* stop is "to allow the officer to pursue his investigation without fear of violence." *United States v. Taylor*, 716 F.2d 701, 708 (9th Cir.1983) (*quoting Adams*, 407 U.S. at 146). To justify a protective pat down during a *Terry* stop, "the officer must be able to point to specific and articulable facts that the individual is armed and presents a risk of harm to the officer or to others." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "The officer need not be absolutely

18

certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. at 27. The Ninth Circuit recognized in *United States v. Mattarolo* that a police officer conducting a stop on reasonable suspicion must choose between being sure the suspect is not armed and jeopardizing his own safety. 209 F.3d 1153, 1158 (9th Cir.), *cert. denied*, 531 U.S. 888 (2000). However, the "narrow scope" of the *Terry* frisk exception only allows a frisk for weapons based on reasonable suspicion *directed at the person to be frisked. United States v. I.E.V.*, 705 F.3d 430, 437 (9th Cir. 2012) (emphasis added) citing *Ybarra v. Illinois*, 440 U.S. 85, 94 (1997).

The Ninth Circuit has "identified a wide variety of factors that can support a reasonable belief that an individual is armed." *United States v. Flatter*, 456 F.3d 1154, 1157 (9th Cir. 2006) (collecting cases). Significant weight is given to an officer's observation of a visible bulge in an individual's clothing that could indicate the presence of a weapon. *Id.*; *see also United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017). Sudden movements, or repeated attempts to reach for an object that is not immediately visible may give rise to a reasonable suspicion a defendant is armed. *Flatter*, 456 F.3d at 1158. The nature of the crime suspected, and whether it is associated with weapons may create reasonable suspicion for a pat down search. *Id.* In *United States v. I.E.V.,* the Ninth Circuit held that "mere nervous or fidgety conduct and touching of clothing" is insufficient to establish reasonable suspicion to conduct a pat down. *United States v. I.E.V.* at 438. To comport with the Fourth Amendment, a police officer must have more than a reasonable belief that *if* the individual with whom contact is made is armed, he or she would be dangerous. *Flatter* at 1158 (finding these factors absent, and holding that the challenged pat down violated the Fourth Amendment since "officers had absolutely no reason to believe that Flatter was armed").

Here, it is undisputed that Propp had reasonable suspicion to conduct the traffic stop. It is also undisputed that Propp patted Cisneros down for weapons as soon as Cisneros got off his motorcycle and complied with Propp's command to approach the patrol vehicle. Propp testified he patted Cisneros down within one to two minutes of when Cisneros got off the motorcycle. The court must therefore determine whether Propp provided specific and articulable facts to support a finding of reasonable suspicion that Cisneros was armed and dangerous. Propp testified that he

decided to frisk Cisneros for weapons for several reasons. First, Propp testified that Cisneros traveled a "pretty significant distance" before pulling over after he activated his lights and sirens. This caused Propp some concern because, in his experience, many times when a suspect delays pulling over, the suspect is thinking about what they are going to do or calling people. Second, Propp was alone during the stop, and although he called for backup, he knew it would take a while for backup officers to arrive. Third, Cisneros was wearing a baggy shirt and pants and had a Mongols vest on. Propp testified he was aware that the Mongols is a violent motorcycle gang. He was also aware of an ongoing feud between two other motorcycle gangs, the Hells Angels and the Vagos, that had resulted in violent encounters between those groups and law enforcement. Fourth, the area where the stop occurred was a "high crime area," or "hotspot" within LVMPD's jurisdiction where there is a lot of violent crime occurring. Fifth, Propp had been involved in an investigation involving a motorcycle group a couple of weeks prior to this stop. This was the investigation involving a stolen vehicle or stolen vehicle parts. Propp testified that after Cisneros stopped, he recognized the motorcycle Cisneros was driving as the motorcycle parked in front of the apartment he had searched in his prior investigation. However, he did not have any contact with Cisneros during the prior incident and did not know or recognize Cisneros before the pat down. During the prior investigation, unidentified motorcycle gang members showed up and Propp believed Mongol members might show up during this stop.

On cross-examination, Propp testified he would have patted Cisneros down even if he had not been wearing a Mongols vest because "if someone is wearing baggy clothes and it's warm, I typically like to pat them down." Transcript 38:16-21. Propp also testified on cross-examination that Cisneros was compliant with all of his commands and did not talk or act aggressively during the encounter. Cisneros kept his hands where Propp could see them at his side, except when he took off his helmet and bandana. Propp acknowledged that because of the type of clothing Cisneros was wearing he could not tell whether Cisneros had a gun. *Id.* 55:16-20. He specifically testified that he did not see a bulge in Cisneros' clothing. *Id.* 55:23-24.

The court finds the government has not met its burden of showing by a preponderance of the evidence under the totality of the circumstances that Propp had reasonable suspicion to believe

Cisneros was armed and dangerous at the time he conducted the pat down. Propp was conducting a routine traffic stop of someone wearing baggy clothing and a Mongols vest in warm weather. Cisneros did not do or say anything to make a reasonably prudent person believe he was armed or dangerous. At most, Cisneros did not pull over as soon as he could have. However, Cisneros was completely compliant with Propp's orders. He made no gestures and took no action which could reasonably be regarded as threatening. Propp did not claim that Cisneros was nervous, fidgety, trying to place his hands in his pocket, or otherwise touching his clothing, as if reaching for a weapon. Rather, Cisneros kept his hands at his side where Propp could see them. None of the reasons cited by Propp for frisking Cisneros provided reasonable suspicion that Cisneros was armed and dangerous. Propp's testimony demonstrated a perfunctory attitude about conducting a frisk of suspects wearing baggy clothing in warm weather. He testified he would have frisked Cisneros even if he was not wearing a Mongols vest because "if someone is wearing baggy clothes and it's warm, I typically like to pat them down."

The court appreciates that traffic stops are potentially dangerous and that a cautious police officer may always suspect a motorist or passenger may be armed. The court also appreciates that a cautious police officer will almost always feel safer conducting a pat down especially if he or she has contact with a suspect alone in a high crime area. Propp testified that at the time of the stop he was aware that the Mongols was a violent motorcycle gang. He was also aware of violent interactions between two different rival motorcycle gangs and law enforcement. However, as the Supreme Court held in *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979), a *Terry* frisk for weapons is permitted based on "a reasonable belief or suspicion directed at the person to be frisked." The fact that Cisneros was wearing a Mongols vest, and that Propp was aware the Mongols were a violent motorcycle group, is insufficient to establish reasonable suspicion that Cisneros was armed and dangerous. Under the Fourth Amendment, more than generalized suspicion and a desire to be cautious is required. At the time the pat down was conducted, Propp had no evidence Cisneros had committed any crime other than a minor traffic violation. The prior investigation Cisneros was tied to involved a non-violent property crime. Cisneros acted in a non-threatening and

compliant manner. For these reasons the court concludes that the pat down violated Cisneros' Fourth Amendment rights to be free from unlawful search and seizure.

### D. Defendant's Statements

The court has found that suppression of the firearm is required because the pat down was conducted without reasonable suspicion that Cisneros was armed and dangerous, and will therefore recommend that the motion to suppress be granted. However, because the government may object and the district judge may not follow the recommendation the court will address whether Cisneros received and waived *Miranda* rights before making admission to Detective Price.

*Miranda* warnings are necessary when a suspect in custody is interrogated by police. *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). The Supreme Court has defined interrogation as "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). The Supreme Court and courts of appeal have repeatedly emphasized that many types of questions are not considered interrogation and do not require *Miranda* warnings. For example, questions asked of a motorist temporarily detained in a traffic stop do not require *Miranda* warnings. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)). Asking a suspect questions regarding general biographical information is not interrogation. *United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000).

A valid waiver of *Miranda* rights depends upon the "totality of the circumstances including the background, experience, and conduct of defendant." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (citing *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986)). There is a distinction between a claim that a *Miranda* waiver is not voluntary and a claim that a *Miranda* waiver was not knowing and intelligent. The voluntariness of a waiver has always depended on the absence of police overreaching. *See Connelly,* 479 U.S. at 170. Although courts often merge the two-pronged analysis, the components should not be conflated. *See Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008). First, a valid *Miranda* waiver requires a showing that it was voluntary and the product of a free and deliberate choice rather than the product of intimidation, coercion, or deception. Second, a valid *Miranda* waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *See*

*United States v. Frank*, 956 F.2d 872, 877 (9th Cir. 1992). Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court conclude that *Miranda* rights have been waived. *Id.* at 877.

The court finds that the government has met its burden of establishing that Cisneros received and waived valid *Miranda* warnings at the police station before he was subjected to a custodial interrogation by Detective Price. Cisneros makes no claim his statement was coerced. The government conceded during oral argument following the evidentiary hearing that it would not seek to introduce any statements or admissions Cisneros made to Propp at the scene of the traffic stop before *Miranda* warnings were administered. The government also conceded that any statements Cisneros made to Propp at the police station were inadmissible as the bodycam video clearly establishes that Cisneros told Propp he did not wish to speak with Propp. The court will therefore enter an order precluding the government from introducing any evidence of admissions made to Propp either at the scene, or at the police station in its case in chief.

For the reasons stated,

**IT IS ORDERED** that:

1.  The government is precluded from introducing any evidence in its case in chief of any statements or admissions Cisneros made to Propp at the scene of the traffic stop prior to the time that *Miranda* warnings were administered.

2.  The government is precluded from introducing any evidence in its case in chief of any statements or admissions Cisneros made to Propp at the police station after *Miranda* warnings were administered as Cisneros clearly stated that he did not want to speak with Propp.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**IT IS RECOMMENDED** that:

1.  Cisneros' Motion to Dismiss for destruction of evidence (ECF No. 30) be **DENIED**.

2.  Cisneros Motion to Suppress evidence recovered from pat down be **GRANTED.**

DATED this 14th day of December, 2017.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE